IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC- GREENBELT
'23 MAR 9 PM 2:52

|  |  |
|---|---|
| PAUL L. AYTCH, JR., <br><br> Plaintiff, <br><br> v. <br><br> CORIZON HEALTH, INC., *et al.*, <br><br> Defendants. | Civil Action No. 21-cv-02287-LKG <br><br> Dated: March 9, 2023 |

## MEMORANDUM OPINION AND ORDER

Self-represented plaintiff Paul L. Aytch, Jr., a state inmate currently confined at Jessup Correctional Institution, filed the instant Complaint pursuant to 42 U.S.C. § 1983, against Corizon Health, Inc.,[1] and Dr. Vivian Dorsey. *See* ECF No. 1.[2] Aytch seeks monetary damages for Defendants' alleged deprivation of his rights. *Id.*

Defendants have moved to dismiss the Complaint, or in the alternative, for summary judgment. ECF No. 16. The Court informed Aytch that, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the failure to file a response in opposition to the Defendants' motion may result in dismissal of the Complaint. ECF No. 17. Aytch responded (ECF No. 18) and Defendants filed a reply (ECF No. 19). Aytch filed an unauthorized surreply (ECF No. 22), which Defendants move to strike (ECF No. 24). Aytch has also filed a Motion for Discovery (ECF No. 21), which is opposed by Defendants (ECF No 23).

The Court has reviewed the pleadings and finds a hearing unnecessary. *See* Loc. R. 105.6 (D. Md. 2021). Defendant Dorsey's Motion to Dismiss or, Alternatively, for Summary Judgment, shall be **GRANTED**. Aytch's Motion for Discovery shall be **DENIED** and Defendant Dorsey's Motion to Strike shall be **GRANTED**.[3]

---

[1] The case is stayed as to Corizon Health Inc. ECF No. 28.
[2] Citations refer to the pagination assigned by the Court's Case Management and Electronic Case Files (CM/ECF) system.
[3] No party is entitled to file a surreply unless otherwise ordered by the Court. *See* Local Rule 105.2(a) (D. Md. 2021). A surreply is most often permitted when the moving party must respond to matters raised for the first time in a reply. *See Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D. D.C. 2001). Aytch's offered

I.  **BACKGROUND**

   **A. Complaint Allegations**

   On September 7, 2021, Aytch filed suit in this Court stemming from the alleged denial of medical care. ECF No. 1. Aytch contends that due to unspecified policies instituted by Corizon Health and carried out by Dr. Vivian Dorsey as the Utilization Management Medical Director, the treatment for severe nerve damage in his neck and spinal region was delayed. *Id.* at 5. Aytch claims that for four years, he notified unidentified employees of the medical department of the issues with his spine, which included an atrophying arm. *Id.* He states that the weakness and atrophy in his arm may not be correctable. *Id.*

   Aytch further alleges that he suffers from an inguinal hernia on the right side of his body which appeared shortly after he began to notice weakness in his right arm. *Id.* Despite notifying the medical department of the hernia, he was advised that surgery could not be approved until the hernia could not be retracted. *Id.* Aytch believes this is dangerous because the intestine could become entangled. He also claims to suffer pain at a level of seven on a ten-point scale due to the hernia. *Id.*

   Lastly, Aytch alleges that he was denied "strength building supplement to assist with physical exercises." *Id.* He claims that Ensure and Glucerna have high amounts of protein, which could have helped with his physical therapy, but he was advised that he did not "qualify under policy." *Id.*

   **B. Dr. Dorsey's Response**

   Dr. Dorsey is a medical doctor employed by Corizon Health since January, 2017 as Utilization Management Medical Director ("UMMD"). ECF No. 16-2 at 1, ¶ 2 (Aff. Dorsey). As UMMD, Dr. Dorsey reviews and approves requests for specialized medical services. *Id.*

   Aytch has a medical history relevant for arthritis, join pain, hernia, and cervical spine issues. ECF No. 16-2 at 2, ¶ 5. On February 19, 2019, Aytch was evaluated by Liberatus DeRosa, M.D. for complaints of right shoulder weakness and pain, as well as right arm pain. ECF No. 16-14 at 31; ECF No. 16-15 at 1-2. At that time, Aytch reported a one-third reduction in strength although he reported heavy exercise in the past year. Examination of Aytch's shoulder was normal; however, the rotational movements of the forearm were decreased.

---

surreply does not respond to matters raised for the first time in Dorsey's reply. As such, the surreply is unauthorized, and Dorsey's Motion to Strike is granted.

Additionally, Dr. DeRosa noted muscle loss in Aytch's right bicep. *Id.* Aytch did not report any complaints of hernia. As a result of the examination, Dr. DeRosa submitted a request for Aytch to be evaluated by an orthopedist. *Id.* at 29. The request was ultimately approved. ECF No. 16-27 at 6-9.

Emmanuel Esianor, P.A. saw Aytch on April 10, 2019, for a periodic examination. ECF No. 16-14 at 20-26. During this encounter, Aytch reported a history of right hernia repair during his childhood; no hernia was noted at that time. *Id.* Aytch reported tenderness in the lumbar spine, and Esianor ordered a routine electrocardiogram ("EKG") and blood work. *Id.*

Dr. Manning examined Aytch on April 23, 2019, due to Aytch's complaints of progressive weakening of the right upper extremity, which began without any injury about one year earlier. ECF No. 16-14 at 15. Aytch told Dr. Manning that he had a similar issue in 2017, which had some resolution followed by reoccurrence. *Id.* Aytch denied suffering right leg weakness, burning, prickling, or numbness in the right harm, a history of stroke, or neck pain. *Id.* During the exam, he did not complaint of arm pain. He had full range of motion of the neck; 5 out of 5 bicep strength on the right side; and 4 out of 5 bicep strength on the left.[4] Dr. Manning observed significant atrophy of the right shoulder girdle and right bicep as well as minimal atrophy of the right triceps. Aytch retained sensation in the right upper extremity. Dr. Manning determined that Aytch suffered from weakness of the right upper extremity of unknown origin and recommended a referral to a neurologist. He also ordered an x-ray of Aytch's cervical spine. *Id.* The x-ray was taken on April 29, 2018, and showed moderate degenerative changes at C4-5; C5-6; and C6-6. *Id.* at 16. On May 7, 2019, Dr. DeRosa requested a neurology evaluation (ECF No. 16-14 at 13), which was approved. ECF No. 16-27 at 12-13. However, a note entered on June 12, 2019, reflected that Aytch's neurology telemedicine consult did not occur due to an inability to connect with the physician team. ECF No. 16-14 at 7.

Darryl Hill, M.D. evaluated Aytch in patient chronic care on August 11, 2019. ECF 16-13 at 30-31. Aytch reported a long history of right-sided weakness and stated that he was to see a neurologist, but the appointment was cancelled. He denied that his symptoms had worsened acutely and did not complain of arm pain. Dr Hill noted that he would assist in rescheduling the consult. On examination, Dr. Hill observed Aytch's right bicep and triceps weakness to be 4/5

---

[4] This appears to be an error in the medical record as all of the weakness/atrophy describes it occurring on Aytch's right side.

3

but otherwise found that Aytch exhibited normal strength. Dr. Hill continued Aytch's medications, which included glucosamine, multivitamins, and Mobic. *Id.* A few days later, Bernard Alenda, NP saw Aytch due to his complaints of arthritis in both wrists. ECF No. 16-13 at 28-29. Alenda continued the prescriptions for Mobic and provided Aytch a wrist splint. *Id.*; ECF No. 16-13 at 27.

Aytch was next seen in patient chronic care on November 9, 2019, at which time no hernia or abnormalities of the right shoulder, elbow or hand was observed. ECF No. 16-13 at 7-11. Similarly, no cervical, thoracic, or lumbar spine tenderness was recorded. *Id.* Aytch's prescriptions for Mobic, multivitamins, and glucosamine chondroitin were renewed. *Id.*

Alenda evaluated Aytch on January 14, 2020, due to Aytch's complaints of a protruding right inguinal hernia. ECF No. 16-13 at 1-2. Dr. Dorsey explains that "[a] hernia is a condition involving bulging of an organ or tissue through an abnormal opening. An inguinal hernia is a bulge that occurs in the region of the groin." ECF No. 16-2 at 5, ¶ 16. Aytch reported that he had the hernia for the past three years and that his pain was five on a ten-point scale, but he did not want to take his pain medication. ECF No. 16-13 at 1-2. Alenda observed a herniated right scrotum, issued Aytch a hernia belt, and instructed him to return to the clinic if he was not able to reduce the hernia. *Id.* Aytch had a valid prescription for Mobic, *id.*, and received a scrotal support device on January 30, 2020. ECF No. 16-12 at 16. On February 5, 2020, it was noted that the hernia belt did not support the area and Aytch was provided scrotal support and directed to follow up if the scrotal support did not work. ECF No. 16-12 at 9-10. Dr. Dorsey avers that Aytch's hernia is unrelated to his cervical spine complaints. ECF No. 16-2 at 5, ¶ 16.

Neurologist Harjit Bajaj, M.D. saw Aytch on January 15, 2020. ECF No. 16-12 at 17; 24-31. At that time, Aytch reported muscle weakness in the right shoulder and numbness in the right arm. He denied neck pain or pain from the neck to the arm and exhibited 5 out of 5 strength in all four extremities. Aytch reported feeling weak in the right shoulder area even though his strength was normal. Dr. Bajaj observed atrophy of the right bicep and deltoid muscles and noted that Aytch reported decreased light touch and pinprick in the right medial forearm. Dr. Bajaj suspected radiculopathy from C5-6 on the right side. He recommended an MRI of the cervical spine followed by an electromyogram and nerve conduction study ("EMG/NCS"). *Id.* Dr. Dorsey explains that "EMG/NCS" are tests that measure the electrical

activity of the muscles and nerves of the body and can help identify nerve abnormalities and the source of such abnormalities." ECF No. 16-2 at 5-6, ¶ 17.

NP Adegorusi saw Aytch in chronic care on February 3, 2020, and Aytch requested a follow regarding his neurology consultation, but Adegorusi was not able to locate the report. ECF No. 16-12 at 11-15. Adegorusi asked the medical department to locate the report and reschedule Aytch. No hernia was noted during the examination, and Aytch's medications were renewed, and blood work ordered. *Id.*

PA Abubaker examined Aytch on February 17, 2020, for a periodic exam. ECF No. 16-12 at 6-7. The examination was unremarkable, and Aytch reported exercising six days a week. *Id.* Two days later, NP Ariku saw Aytch regarding the neurology consult but no report had been uploaded. Ariku asked the scheduler to obtain a copy of the report. *Id.* at 4.

Based on Dr. Bajaj's recommendation, on February 25, 2020, Dr. Naznin Esphani requested an MRI of Aytch's cervical spine, an EMG/NCS, and a follow up with Dr. Bajaj after the testing was complete. ECF No. 16-11 at 24-26, 28, 30.

On February 28, 2020, Dr. Dorsey reviewed Dr. Esphani's request. ECF No. 16-27 at 17-23. Dr. Dorsey noted that although Aytch had reported a history of weakness in the right shoulder area for three years, his strength was recorded as 5 out of 5 at all extremities on examination. His condition appeared to be chronic, *i.e.*, stable rather than acute. Dr. Dorsey determined that the specialist services were not medically necessary as the testing requested was intended to determine whether Aytch required cervical spine surgery; however, Dr. Dorsey did not believe Aytch was a candidate for spinal surgery at that time and therefore the diagnostic testing was not necessary. Dr. Dorsey explains that she based her opinion on Aytch exhibiting normal strength in all extremities and therefore his activities of daily living were not impacted. ECF No. 16-2 at 8, ¶ 26. While atrophy of the right bicep and deltoid were observed with subjective reports of decreased sensation in the right forearm, the symptoms did not constitute sufficient indication for a spinal surgery and its attendant risks. ECF No. 16-2 at 8, ¶ 26. Additionally, Dr. Dorsey's review of the medical records indicated that Aytch was medically stable. Further, while Dr. Bajaj believed that Aytch's arm atrophy originated in the cervical spine, Aytch did not report neck pain. According to Dr. Dorsey, spinal surgery "could result in neck pain which did not exist before the surgery." *Id.*

As to the request for physical therapy, Dr. Dorsey did not believe it was required because Aytch's strength was normal. Dr. Dorsey recommended that Aytch's right upper extremity complaints be monitored, and he be assessed for acute changes to his condition. *Id.*; ECF No. 16-11 at 27; ECF No. 16-27 at 17-23. Dr. Dorsey opines that reasonable medical providers could disagree as to whether an MRI, EMG/NCS, and follow up appointments were medically necessary at that time. ECF No. 16-2 at 9, ¶ 27.

Dr. Esphani evaluated Aytch on March 19, 2020. ECF No. 16-11 at 15-16. At that time, Aytch exhibited proximal and distal weakness of muscles in the right upper extremity as well as sensory deficit. Atrophy of the right bicep and triceps muscles were also observed, and Dr. Esphani resubmitted the request for an MRI of Aytch's cervical spine. *Id.* at 18. Dr. Dorsey approved the request based on Dr. Esphani's report that Aytch's weakness had progressed. ECF No. 16-27 at 25-31.

The following month, Dr. Robert Williams examined Aytch due to his complaints of right shoulder pain and weakness as well as right inguinal hernia, which Aytch reported caused increasing pain. ECF No. 16-11 at 7-8. Aytch expressed his displeasure that the requests for MRI and EMG/NCS had not been approved. Examination revealed a right inguinal hernia that was tender to the touch and reducible. *Id.* Atrophy of the right bicep was observed, but Dr. Williams did not order any additional interventions. *Id.* That same day, Dr. Esphani entered a staff note that the alternative treatment plan ("ATP") was based on the clinical examination finding of another provider and Aytch would be reevaluated. *Id.* at 9.

The MRI of Aytch's cervical spine was conducted on May 22, 2020. ECF No. 16-10 at 15-26. The MRI revealed "[d]egenerative changes of the cervical spine with multilevel severe bilateral neuroforaminal stenosis due to uncovertebral and facet hypertrophy." *Id.* at 25. The MRI ruled out high grade spinal canal stenosis and showed a "diffusely decreased T1 narrow signal." *Id.* Straightening of cervical lordosis without focal listhesis was also shown. *Id.* Aytch's medical records demonstrate that MRI report was not uploaded to his chart until July of 2020, despite multiple requests. ECF No. 16-10 at 3-8.

Dr. Dorsey explains that degenerative disc disease ("DDD") is common and occurs when the discs of the spine lose integrity as a normal part of aging. ECF No. 16-2 at 6, ¶ 18. Intervertebral discs provide height and facilitate movement in the lower back. As a person ages, the water content of the discs decreases, resulting in discs deteriorating and losing their

6

cushioning function. *Id.* The disc thins leading to a lessening of space between the vertebrae as well as over-riding of the facet joint. *Id.* DDD is frequently associated with spinal stenosis and foraminal stenosis, the narrowing of the canals in the spine. *Id.*

Dr. Dorsey further explains that cervical radiculopathy occurs when a nerve root in the cervical spine becomes inflamed or damaged due to compression. ECF No. 16-2 at 6, ¶ 19. Sufferers of cervical radiculopathy typically have complaints of neck or arm pain and may experience muscle weakness and/or numbness/tinging in fingers or hands. *Id.* Treatment for pain arising from cervical radiculopathy may be nonsteroidal anti-inflammatories or steroid injections. *Id.* Physical therapy may also help in reducing pain. *Id.* Dr. Dorsey avers that most patients with cervical radiculopathy improve without surgical intervention through conservative treatment. *Id.* Surgery is indicated where conservative measures have not worked and where a patient experiences worsening symptoms, persistent symptoms, or pain that interferes with the activities of daily living. *Id.* Cervical spine surgery, however, carries risks including nerve root damage, spinal cord damage, infection, intractable pain and/or disc herniation. *Id.* Further, additional surgeries may be required particularly where cervical segments are fused in the spine because the spine next to where the surgery was performed takes on more stress, which can lead to increased wear and tear on the neighboring spine resulting in pain. *Id.*

Dr. Esphani next examined Aytch on July 27, 2020. ECF No. 16-10 at 1-2. He noted distal weakness in the right arm with sensory disturbance consistent with radiculopathy originating form C5-7. *Id.* Aytch did not complain of the hernia, and Dr. Esphani requested a consultation with neurosurgery. ECF No. 16-9 at 30. Prior to the surgical evaluation, Dr. Dorsey recommended an EMG/NCS to assess whether the right upper arm abnormalities were related to the degenerative disc disease in his cervical spine. ECF No. 16-28 at 5-7.

On August 25, 2020, and August 28, 2020, Dr. Esphani requested physical therapy and an EMG/NCS, respectively (ECF No. 16-9 at 19, 23), which Dr. Dorsey approved (ECF No. 16-28 at 8-12). Aytch was evaluated for physical therapy on September 9, 2020, and attended physical therapy on September 10, 15, 17, 22, and 24, 2020. ECF No. 16-9 at 8-11; 14-16.

During a chronic care appointment on October 7, 2020, the provider noted mild atrophy of Aytch's right arm and that he had undergone physical therapy with little benefit. ECF No. 16-9 at 6-7. Per the previous neurological consult, the next step was an EMG. The doctor submitted a consultation request for EMG that day. *Id.* at 4.

A note in Aytch's medical record dated December 9, 2020, indicated that while the EMG/NCS was approved and scheduled for November, it was cancelled by the off-site provider. ECF No. 16-8 at 20. Dr. Dorsey avers that neither she nor any other Corizon staff member have authority over the off-site provider's schedule. ECF No. 16-2 at 11, ¶ 36.

On January 21, 2021, during a provider visit, Aytch requested Ensure, a nutritional supplement, because he felt his weight was fluctuating and he was malnourished. ECF No. 16-8 at 13. The provider did not order the requested Ensure and noted that Aytch was overweight. *Id.* They also noted that the scheduler was working to reschedule the EMG/NCS. *Id.*

Aytch tested positive for COVID-19 on January 23, 2021, and was placed in isolation for monitoring until February 2, 2021. ECF No. 16-7 at 21-31; ECF No. 16-8 at 1-12; ECF No. 16-22 at 10-30.

On March 2, 2021, Aytch was seen by a provider for his periodic physical exam. During that time, he did not express any complaints about his neck or hernia. ECF No. 16-7 at 16-17.

A provider saw Aytch on March 10, 2021, regarding his request for Ensure. ECF No. 16-7 at 11. The provider again noted that Aytch was overweight and that his weight had not fluctuated significantly. Ensure was not ordered. *Id.*

A neurologist saw Aytch on April 6, 2021, to conduct the EMG/NVS. ECF No. 16-6 at 26-31. Aytch reported weakness, heaviness, and atrophy of his right upper arm. *Id.* at 26. The neurologist noted thinning of the right deltoid and bicep muscles as compared to the left, while Aytch reported mild tingling in the fourth and fifth fingers. *Id.* at 26, 27. Strength of 5/5 in all extremities, except for right elbow flexion, which was measured at 4/5, was recorded. *Id.* at 27. The EMG/NCS showed moderate chronic right C5, C6 and C7 radiculopathies; mild right ulnar neuropathy across the elbow; and mild to moderate median neuropathy at the right wrist. *Id.* at 27. The neurologist noted his belief that the weakness in the arm was due to cervical radiculopathy and recommended referral to a spinal surgeon as well as physical therapy. *Id.* at 28. He determined that Aytch's reported numbness in the fingers did not need to be addressed at that time and that the neuropathy in the right wrist was asymptomatic. *Id.*

On April 18, 2021, requests for spinal surgery consultation and physical therapy were submitted. ECF No. 16-6 at 13-18. The request for physical therapy was approved, ECF No. 16-28 at 18-21, and Aytch attended physical therapy on April 28, 29, May 4, 6, 11, and 13, 2021. ECF No. 16-6 at 1, 3-4, 7, 9-10. Another UMMD recommended an ATP regarding the requested

surgical consultation, but Dr. Dorsey overturned that decision noting the primary care provider's note that Aytch's pain and atrophy had progressed. *Id*. at 13.

Aytch was seen by a provider on June 4, 2021. At that time, he was advised that the surgical consultation for his cervical issues had been approved. ECF No. 16-5 at 26-27. Aytch also complained of hernia pain and the provider noted that he was not wearing the hernia belt and advised him to do so. Aytch's pain medication was continued. *Id.*

On June 27, 2021, Aytch again requested Ensure or protein supplements to rebuild his muscles. ECF No. 16-5 at 21. The provider noted that Ensure was not clinically indicated and that the medical department did not write prescriptions for protein powder. Aytch was advised to continue his physical therapy and strength training. *Id.*

Aytch attended his neurosurgical consultation on August 4, 2021. ECF No. 16-5 at 1-4. Aytch reported four years of right arm pain, which worsened over time. He also reported right-sided neck pain that radiated to the right shoulder as well as arm weakness that developed over the last year. He advised the surgeon that he had completed physical therapy and focused on strengthening his right arm when lifting weights. He also reported some finger numbness. *Id*. at 1. During examination, Aytch exhibited full passive range of motion in the cervical spine without pain. However, he reported right sided shoulder pain. *Id*. at 2. The neurosurgeon noted normal muscle bulk and tone with 5 out of 5 strength in all four extremities except Aytch's right bicep which measured "4+". *Id*. at 3. Aytch's sensations and reflexes were normal. *Id.* The neurosurgeon assessed Aytch as suffering from degenerative disc disease of the cervical spine and neural foraminal stenosis of the cervical spine, and recommended a C4-7 anterior cervical discectomy and fusion. *Id*. at 4.

On September 5, 2021, Aytch was seen by a provider who requested the cervical discectomy and fusion surgery recommended by the neurosurgeon (ECF No. 16-4 at 23-25), which Dr. Dorsey approved (ECF No. 16-28. at 22-24). The surgery was performed on October 7, 2021, and Aytch was returned to the JCI infirmary that day. ECF No. 16-4 at 2-14; ECF No. 16-21 at 2-16. The following day, Aytch was discharged from the infirmary to his cell. ECF No. 16-3 at 30; ECF No. 16-4 at 1.

On October 12, 2021, Aytch was seen by a provider complaining of a hernia, which he was not able to reduce.[5] ECF No. 16-3 at 28-29. That day, the provider requested a surgical evaluation of the hernia, *id.* at 26, which Dr. Dorsey approved. ECF No. 16-28 at 25-27, 29.

Aytch was again seen by a provider on October 23, 2021. ECF No. 16-3 at 23-24. At that time, the provider noted that Aytch had done well since his spinal surgery and was scheduled for surgical consultation regarding the hernia. *Id.*

The surgical consultation regarding the hernia occurred on October 28, 2021. ECF No. ECF 16-3 at 18-20. Aytch presented with a symptomatic right inguinal hernia, and the surgeon recommended surgical repair. *Id.* On November 4, 2021, Aytch was seen at sick call inquiring about the surgery consult. At that time, it was noted that no consultation had been requested and the nurse practitioner notified medical records to have the paperwork retrieved for processing. *Id.* at 13. On November 8, 2021, the provider requested the surgery, *id.* at 11-12, and Dr. Dorsey approved the request. ECF No. 16-28 at 29-31. Dr. Dorsey had no other involvement in the treatment of Aytch's hernia. ECF No. 16-2 at 15, ¶ 54. On November 26, 2021, a note was entered in Aytch's chart indicating that the surgery had been approved on November 9, 2021, and the procedure was to be scheduled. ECF No. 16-3 at 9. At that time, he had an active prescription for Mobic. *Id.* at 10.

## II.    STANDARD OF REVIEW

Defendant Dorsey's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF No. 16. Motions styled in this manner implicate the Court's discretion under Fed. R. Civ. P. Rule 12(d). *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp.2d 431, 436–37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

---

[5] Aytch had been provided scrotal support on September 23, 2021. ECF No. 16-4 at 19.

Because Defendant Dorsey's Motion is titled as a motion to dismiss or, alternatively, for summary judgment, Aytch was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. Thus, the Court will review Aytch's claims under the Rule 56(a) standard and will consider the exhibits and declaration filed in support of the dispositive motion.

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is generally inappropriate however "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). "[T]he party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC,* 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam). On the other hand, a nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019).

11

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at their own risk, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). However, the failure to file a Rule 56(d) affidavit cannot oblige a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Aytch filed a Motion for Discovery seeking "verification by neurological testing to determine if delays to obtain preventative treatment were created by Dr. Vivian Dorsey, M.D.'s decision not to adhere to recommendations by Dr. Bajaj's recommendations where delays that exacerbated Plaintiff's stated injuries . . . ." ECF No. 21. The Motion is denied. Aytch has not filed an affidavit under Rule 56(d) or offered any explanation as to why the requested information is necessary for him to oppose the pending dispositive motion. Further, such information is not uniquely within the possession of Defendant. Lastly, the information Aytch seeks is essentially for the Court to appoint him an expert witness to assist him in proving his case. While the Court has broad discretion to appoint an independent expert under Fed. R. Evid. 706, "[t]he policy behind the rule is to promote the jury's factfinding ability" not to benefit one party who has failed to marshal their own evidence. *Ford v. Mercer Cnty. Corr. Ctr.*, 171 Fed. App'x. 416, 420 (3d Cir. 2006); *see Stones v. McDonald*, 7 F. Supp. 3d 422, 432 (D. Del. 2014).

(holding Fed. R. Evid. 706 "is not intended to ensure that indigent plaintiffs have access to expert witnesses in order to make their case.")

As previously stated, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011)). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007). *See also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

The Court is mindful that Aytch is a self-represented litigant. A federal court must liberally construe pleadings filed by *pro se* litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But liberal construction does not mean that a court can ignore a clear failure in the pleadings to allege facts which set forth a claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

### III.   ANALYSIS

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, Aytch must demonstrate that Defendant Dorsey's acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 842. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

"Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as "exacting"). A mere disagreement between an inmate and a physician over the appropriate level

of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto*, 841 F.3d at 225. Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)). Additionally, where the seriousness of the injury is not apparent, a delay in treatment does not violate the Eighth Amendment. *Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980) (delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent").

Dr. Dorsey argues she is entitled to summary judgment because the undisputed facts demonstrate that she was not deliberately indifferent to Aytch's medical needs. Viewing the evidence in the light most favorable to Aytch, the Court finds no deliberate indifference on her part.

Dr. Dorsey does not contest that Aytch's cervical issues or inguinal hernia are objectively serious medical needs. However, nothing in the record shows that Dr. Dorsey's decisions regarding the treatment of either of these issues amounted to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. While Aytch contends that Dr. Dorsey's failed to approve Dr. Esphani's requests for MRI, EMG/NCS, and the neurology appointment with Dr. Bajaj, thus causing his delayed treatment, he is simply mistaken.

While it is true that in February of 2020, Dr. Dorsey declined the initial request for diagnostic testing and follow-up with Dr. Bajaj in favor of observation, that decision was based on Aytch's medical records which showed his condition was stable and he had full strength in all extremities. In that light, Dr. Dorsey did not believe spinal surgery, with its attendant risks, was necessary. Because diagnostic testing was requested simply for the purpose of determining the necessity of surgery, Dr. Dorsey she did not feel that they were necessary at that time. Instead, she recommended that Aytch's condition be observed for progression of pain or weakness.

One month later, after Dr. Esphani documented worsening weakness and atrophy of Aytch's muscle, Dr. Dorsey approved Dr. Esphani's request for MRI. The MRI was conducted in May. There was an apparent delay in Aytch's providers receiving the MRI report and in July, after receiving the report, Dr. Esphani referred Aytch for a neurosurgery evaluation. Dr. Dorsey

15

recommended an EMG/NCS prior to the surgical evaluation to better assess the origin of Aytch's symptoms. Notably, Dr. Bajaj, the neurosurgeon, had also requested an EMG/NCS for Aytch before returning for follow up. Dr. Esphani requested the EMG/NCS, and Dr. Dorsey approved it. Unfortunately, the scheduling of the EMG/NCS took time and the initially scheduled test was cancelled by the provider: events all outside of Dr. Dorsey's control. After the EMG/NCS was completed, Dr. Dorsey timely approved the request for neurosurgery consult and ultimately approved the request for surgery.

The delays in scheduling the MRI and EMG/NCS and having the reports of those tests provided to Aytch's treating physicians at his place of confinement are not attributable to Dr. Dorsey. Moreover, the medical records do not reflect that he has been harmed by any delay in receiving treatment. Significantly, Aytch did not exhibit any significant change in arm strength between the orthopedist's examination on April 23, 2019, and the neurosurgeon's examination of him on August 4, 2021.

As to Aytch's hernia, the record reflects that Dr. Dorsey's only involvement was in approving the requests for surgical consultation and surgery. Such approval was provided in a timely manner in response to Aytch's providers' requests.

Lastly, the record reflects that Dr. Dorsey was not involved in approving or denying Aytch's requests for nutritional supplements. The record further reflects that the supplements were not medically indicated.

An Eighth Amendment claim is not presented where, as here, a plaintiff's claim relies on the assertion that they were not provided the exact medical treatment they desired. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)).[6]

---

[6] To the extent Aytch's Complaint could be construed as raising state law claims, the Court declines to exercise supplemental jurisdiction. *See* 28 U.S.C. §1367(c)(3); *United Mine Workers v. Gibbs*, 383 U. S. 715, 726 (1966).

In light of the foregoing, it is this 9th day of March, 2023, by the United States District Court for the District of Maryland, hereby **ORDERED THAT**:

1. Defendant Vivian Dorsey, M.D.'s Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 16) **IS GRANTED**;

2. Judgment **IS ENTERED** in favor of Defendant Dorsey and against Aytch;

3. Defendant Dorsey's Motion to Strike (ECF No. 24) **IS GRANTED**;

4. Aytch's Motion for Discovery (ECF No. 21) **IS DENIED**; and

5. The Clerk **SHALL TRANSMIT** a copy of this Memorandum Opinion and Order to Aytch and counsel of record.

**IT IS SO ORDERED.**

LYDIA KAY GRIGGSBY
United States District Judge